CHARLES A. AMBACK *vs.* WEBSTER WOOLEN COMPANY.

Androscoggin.     Opinion March 18, 1911.

*Bills and Notes.    Payment.    Extension of Time.    Consideration.
Mutual Promises.    Evidence.*

An agreement by a stockholder that the time of payment of a note due him from the corporation be deferred until payment of present and future outside creditors is not void as being too indefinite as to duration of the extension.

An agreement by a stockholder that payment of a note due him from the corporation be deferred until payment of present and future outstanding creditors is supported by similar agreements by the other stockholders, who held similar notes.

In an action against a corporation by a stockholder on a note which was not payable until outside creditors of the corporation should be paid, or until the company's assets should equal its liabilities, evidence *held* to show nonfulfilment of either condition.

On motion and exceptions by defendant.    Motion sustained.

Action of assumpsit on a promissory note.    Plea, the general issue with a brief statement alleging certain special defenses and which sufficiently appear in the opinion.    Verdict for plaintiff for $5000.    The defendant filed a general motion for a new trial and also excepted to several rulings.

The case is stated in the opinion.

*McGillicuddy & Morey,* for plaintiff.

*John A. Morrill,* for defendant.

SITTING:   EMERY, C. J., WHITEHOUSE, SPEAR, KING, BIRD, JJ.

KING, J.   The defendant corporation was organized July 1, 1889, with a capital stock of $100,000 which was taken and paid for by four stockholders as follows:   Robert Bleakie $43,000, John S. Bleakie $32,000, Charles Bigelow $20,000, and Charles A. Amback

(the plaintiff) $5000. Each of these stockholders, at the time of the organization, also loaned the corporation an additional sum equal in amount to his stock, for which the corporation gave its promissory note. Each note was dated July 1, 1889, and was the same in tenor, excepting as to the amount and name of the payee. The note given to the plaintiff was as follows:

$5,000.00 "Sabattus, Maine, July 1, 1889.

For value received, the Webster Woolen Company promise to pay to Charles A. Amback or order, in one year after date, without grace, the sum of Five Thousand Dollars, with interest thereon until fully paid at the rate of eight per cent per annum, payable semi-annually if the principal is so long unpaid. In case this note is not presented for payment when due the payment of the principal sum shall not be enforced thereafter, until thirty days shall have elapsed from the time written notice of the desire for the same has been given to said Company at its office at Sabattus, Maine, either through the mail or by personal service, or delivered in hand to its Treasurer for the time being.

WEBSTER WOOLEN COMPANY

By HENRY W. BUNTON,

Approved, Its Treasurer.

ROBERT BLEAKIE.
JOHN S. BLEAKIE.
CHARLES BIGELOW.
Directors."

Subsequently, August 1, 1898, there was written across the face of this note the following:—

"The undersigned, owner of this note agrees that its payment shall not be made until the present and future indebtedness of the Webster Woolen Company to persons or corporations, except for notes of a similar tenor to this originally given to a stockholder, has been fully paid.

August 1st, 1898.

(Signed) CHARLES A. AMBACK."

A like agreement was written across the face of each of the other notes and signed by the payee thereof.　Interest was regularly paid on the notes according to the tenor thereof to July 1, 1900.　At a special meeting of the directors of the corporation held March 16, 1901, it was voted that the interest on these notes "be stopped for a period of three years, or until such time as the debt of the Company (balance to debit of the Profit & Loss account) of $40,026.16, as shown at the last stock taking, be paid from the profits of the business.　The same to apply from the first of July, 1900.　The consent of all the stockholders to this action having been obtained."　No payment of either principal or interest was made on any of the notes thereafter.

This action is upon the $5000 note so given to the plaintiff, and the jury returned a verdict in his favor for the $5000 without interest.　The case is before this court on motion and exceptions by the defendant.　The defendant raised no question as to giving the note, or as to the thirty days demand before suit, but contended that the note was not payable at the time suit was brought under the agreement of August 1st, 1898, written across its face and signed by the plaintiff.

To justify the verdict it must appear that the evidence authorized the jury to find, either (1) that the plaintiff was not bound by that agreement, or (2) that, if bound by it, the condition therein limiting the time of payment of the note, had been complied with.

I.　The plaintiff contended that the agreement was void because too indefinite as to the time the extension was to continue.　But the presiding Justice instructed the jury otherwise, hence the verdict cannot be regarded as based on that contention, and accordingly it is not here to be considered.

Further, the plaintiff contended that there was no consideration for his agreement to postpone the time of payment of the note.　As to this issue the presiding Justice said to the jury: "And in this case, to bring the question right down to the facts here, if, by a mutual arrangement between all of the parties to these various notes, it was agreed upon and promised by each of them, with the knowledge and assent of the others, so they were all doing the

same thing, and knew that they were doing the same thing for the same purpose — I say if each of them promised to extend the note which he had—postpone its payment—and Mr. Amback as a part of that arrangement entered into it and did the same, then the promise of the other parties to extend their notes would be a sufficient and lawful consideration for his promise to extend his note. And if these were the facts, as claimed by the defendant, then his promise to extend the note would, so far as consideration is concerned, be valid and binding and would prevent him from maintaining any suit upon the note until the conditions arose which this promise contemplates in regard to the payment of the debts." The plaintiff has no cause to complain of the instructions given as to the question of consideration for the agreement of Aug. 1st, 1898, for they were sufficiently favorable to him, and are sustained by the authorities, *Haskell* v. *Oak*, 75 Maine, 519.

After a careful examination of all the evidence the court is constrained to the opinion that the jury would not have been justified in finding that there was not a mutual arrangement between the plaintiff and the other holders of these capital notes to postpone the time of their payment until the other debts of the corporation were paid or provided for, or that when the plaintiff signed the agreement to that effect written across the face of his note he did not do it understanding that he was doing what had been mutually agreed to be done, and because the others had agreed to the same thing. On the other hand we think the evidence leaves no doubt that there was such a mutual arrangement between the holders of the capital notes, and that the plaintiff signed his agreement in execution of that mutual arrangement.

It clearly appears that Mr. Amback, the plaintiff, had knowledge of the financial condition and needs of the corporation on Aug. 1, 1898. He was one of its four stockholders from its organization. He was its clerk from its organization to August, 1910, and one of its directors from 1902 to 1910. He also held the office of auditor of the corporation, and he was superintendent of its business from its beginning to August, 1909. An account of stock was taken each six months down to 1905, in which the plaintiff took an active part,

and received a copy of the trial balance after each stock-taking. The affairs of the corporation were freely talked over between the plaintiff and the other stockholders. Mr. Robert Bleakie, who largely provided the working capital for the corporation, and indorsed its outside notes testified that he and Mr. Amback talked over together the affairs of the corporation thoroughly, and the plaintiff does not contend that such was not the fact.

The trial balance of June 30, 1898, shows liabilities as follows:

| | |
|---|---:|
| Capital | $100,000 |
| Notes Corporation | 100,000 |
| Notes payable | 119,000 |
| Robert Bleakie Private Acct. | 22,000 |
| John S. Bleakie Private Acct. | 24,000 |
| Charles Bigelow Private Acct. | 20,000 |
| Charles A. Amback Private Acct. | 8,001.03 |
| Oelbermann Dommerick & Co. | 21,738.75 |
| Cooley, Turnbull & Co. | 30,000 |
| Total | $444,739.78 |

The assets as shown by this trial balance were $39,385.81 less than the liabilities. Mr. Charles Bleakie had indorsed the notes of the corporation, outside the capital notes. With respect to the arrangement to postpone payment of the capital notes Mr. Bleakie was asked if the matter was talked over between him and the plaintiff and he said it was; that he talked with him as to the financial condition of the company as shown by the account of stock taken in the summer of 1889.

Q. Do you remember the talk in regard to making this arrangement of all the stockholders?

A. Yes, sir.

Q. State whether or not it was by mutual arrangement of all the stockholders?

A. By mutual arrangement—every man that held stock.

Q. What was the object of it?

A.    The object was that, as we all recognized and knew, that we considered the stock of the company $200,000, that there would be no doubt left of making us solid, $200,000, by having the endorsement put on there.

Q.    And was that talked over with Mr. Amback ?

A.    Yes, sir.

Q.    By you personally ?

A.    By both myself, and I think my brother talked to him too. He knew all about it."

After the agreement was made to postpone the payment of the capital notes Mr. Bleakie retired the outstanding notes of the company with his own funds and carried it in his private account. He also thereafter furnished needed money for the operations of the company which was carried in his private account.   He said:   "I have furnished it, so that the Webster Woolen Company hasn't for years had a piece of paper on the market."   Mr. Charles Bigelow, a stockholder and payee in one of the capital notes for $20,000, testified that the arrangement to postpone payment of those notes was mutual between the holders thereof, and was made "to strengthen our credit in the market."   He said that he personally talked with the plaintiff about the matter of the agreement to postpone payment of the notes, the substance of the talk being that it would be for the best interest of the company to do so.

Mr. Amback in his direct examination admitted that he signed the agreement written across the face of his note, and thought he signed it at Sabattus.   Asked whether there was a meeting at Sabattus "about the endorsement upon these notes to that effect" he said "not as I remember."   In his cross examination he said he did not remember of talking about the agreement with Mr. Robert Bleakie, or with Mr. Bigelow.   He did remember that Mr. Bleakie came to Sabattus in the summer of 1898 after the trial balance of June 30, 1898, and talked with him as to the indebtedness of the company and the notes that were out.   The following portion of Mr. Amback's cross examination makes it sufficiently evident we think that there was a mutual arrangement between the holders of these capital notes to postpone their payment, and that the plaintiff

entered into that arrangement and made his agreement on his note because and with the understanding that the others had made or would make a like agreement with respect to their notes. He was asked :

"Q. Now what do you recall about the circumstances of making that agreement—I mean the agreement of August 1, 1898, the one that is endorsed on that note?

A. All I remember is that we stopped the payment on the notes. I don't recollect anything about that red writing, but I know it is my signature. . . .

Q. And all your remembrance is now that you alone of those stockholders signed that agreement?

A. Well, I know the others must have signed it if I did, but I didn't see their notes.

Q. Then you knew that the other stockholders signed similar agreements?

A. I couldn't swear to it, but I supposed they would.

Q. You understood that they did, didn't you, as a matter of fact?

A. I didn't understand it so. I only knew that I signed that, but I didn't see their notes.

Q. When you signed that didn't you understand that the other stockholders did the same thing on their notes?

A. I didn't understand it, but I supposed they did.

Q. You were satisfied that they would, weren't you?

A. Sure.

Q. And you signed that at the time satisfied that the other stockholders were doing the same on their own capital notes?

A. Yes, sir.

II. Were the jury justified in the evidence in finding that the condition of the agreement postponing the payment of the note had been fulfilled? We think not. That condition was "until the present and future indebtedness of the Webster Woolen Company to persons or corporations, except for notes of a similar tenor to this originally given to a stockholder has been fully paid."

In his instructions to the jury the presiding Justice made a distinction between debts that might be regarded as temporary—incurred in carrying on the business, for material, etc., which were to be liquidated from the proceeds of the manufactured goods—and the more permanent debts of the company, which were to be carried as a somewhat continuing liability, and not to be paid from the immediate proceeds of goods sold, in which class he included the private accounts of the stockholders, and the notes and accounts payable (except the capital notes) so far as they should appear to be of the character of a standing or somewhat permanent liability of the company. And the jury were instructed that the note in suit was not payable, and the suit was premature, unless such permanent debts had been paid, or unless the company had been in funds which it ought to have applied to the payment of such debts. It is not important to determine here, perhaps, whether such is the correct construction of the language of the agreements to postpone the payment of the capital notes, or whether the more reasonable interpretation of the language used is that the capital notes were not to be payable so long as the assets of the company were less than all its liabilities, including its capital stock and capital notes, and while there was a deficiency. The latter construction, however, seems to be more consistent with what it is reasonably to be inferred the parties intended under the necessities of the situation and circumstances. But under either construction of the agreement it is evident from an examination of the evidence that the jury were not authorized to find that the condition of the agreement had been fulfilled at the time this action was brought.

The trial balance of July 31, 1898, shows $159,000 of "notes payable," outside the capital notes. There is no evidence tending to show that this indebtedness was temporary, but on the other hand the financial affairs of the company prior to that date as disclosed in the evidence, together with the fact that the existence of these outstanding notes bearing the personal indorsement of Mr. Robert Bleakie was the essential element of the necessity for the agreement to postpone payment of the capital notes, and the further fact that thereafter these "notes payable" were taken up by

Mr. Bleakie personally and carried as a debt of the company to him, shows conclusively that a part, at least, if not the whole of the "notes payable" falls within the class of permanent indebtedness which under the ruling of the presiding Justice was within the meaning of the agreement of Aug. 1, 1898. It is plain that that indebtedness (changed though it was from time to time) had not been paid, within the meaning of the agreement, at the time this suit was brought. As above indicated, Mr. Bleakie took up the outstanding notes personally and carried the amount as a debt of the company in his private account, together with such additional sums as he advanced for the company. The trial balances introduced show the private account of Mr. Bleakie to have been as follows : July 31, 1898, $18,000; Dec. 31, 1900, $80,000; June 30, 1905, $180,000; June 30, 1907, $182,000; June 30, 1908, $221,000; June 30, 1909, $220,000; and June 30, 1910, $261,000. We are unable to discover any evidence that the "present and future indebtedness" of the company, so far as it was included in the outstanding "notes payable" July 31, 1898, had "been fully paid" when this suit was brought. On the other hand the conclusion is irresistible that it had not been. From an examination of the evidence a like conclusion follows in respect to the private accounts of Mr. Robert Bleakie and John S. Bleakie. That of the latter is shown by the trial balances to have been as follows : July 31, 1898, $24,000; Dec. 31, 1900, $40,801.98; June 30, 1905, $16,791.98; June 30, 1907, $12,882.15; June 30, 1908, $13,270.54; June 30, 1909, $12,882.15; and June 30, 1910, the same $12,882.15. It cannot be reasonably claimed from the evidence that these private accounts did not comprise indebtedness of the company within the meaning of the agreement of Aug. 1, 1898, or that such indebtedness had been fully paid.

If the other suggested construction of the language of the agreement to postpone payment of the capital notes is applied— that the notes were not to be payable until such time as the assets of the company should equal all its liabilities, in other words, until its deficit was made good— still the evidence shows the condition of the agreement to be unfulfilled. July 31, 1898, there was a deficit of $39,385.81;

Dec. 31, 1900 it was $46,026.16 ; June 30, 1905, the trial balance shows the deficit to be $13,360.43.    It appears that there was no stock-taking at that time, and the trial balance shows "loss for 6 months $4,466.84."    'From that time there was no stock-taking until June 30, 1910, and accordingly the deficit stands the same $13,360.43, in the trial balances of June 30, 1907, June 30, 1908, and June 30, 1909.    But in the trial balance of June 30, 1910, after stock-taking, the deficit appears as $49,756.34.    We find no evidence in the case which authorized the jury to find that there was any time after Aug. 1, 1898, when the defendant's assets equaled all its liabilities, or when its capital— including its capital stock and capital notes—was not materially impaired.

In accordance with the foregoing conclusions it is the opinion of the court that the jury were not authorized by the evidence to find in the plaintiff's favor on either branch of the case as submitted to them, and their verdict must be set aside.    This conclusion renders it unnecessary to consider the exceptions.    The entry will be,

*Motion sustained.*
*Verdict set aside.*